1 STEPHEN A. WEISS, ESQ.
(*pro hac vice* forthcoming)
2 sweiss@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.
3 (*pro hac vice* forthcoming)
jsmigelsky@seegerweiss.com
4 **SEEGER WEISS LLP**
5 55 Challenger Road, 6th Floor
6 Ridgefield Park, NJ 07660
7 Tel:  (973) 639-9100
Fax:  (973) 639-9393
8

9 SHAUNA B. ITRI, ESQ.
(*pro hac vice* forthcoming)
10 sitri@seegerweiss.com
11 **SEEGER WEISS LLP**
12 1515 Market Street, Suite 1380
Philadelphia, PA 19102
13 Tel: (215) 564-2300
14 Fax: (215) 851-8029

15 *Attorneys for Plaintiff/Relator, Oxnard Challenger LLC*





FILED
CLERK, U.S. DISTRICT COURT

NOV 2 2 2022

CENTRAL DISTRICT OF CALIFORNIA
BY        TV        DEPUTY

No Summons
Issued
No CV-30

16 **UNITED STATES DISTRICT COURT**
17 **CENTRAL DISTRICT OF CALIFORNIA**
18 **WESTERN DIVISION**

UNITED STATES OF AMERICA,    ) Case No. 2:22-cv-08552-PA-MRWx
19
*Ex rel.* OXNARD CHALLENGER
20 LLC,
21
                        Plaintiffs,
22
        vs.
23
PTI TECHNOLOGIES INC.,
24 VACCO INDUSTRIES, and ESCO
25 TECHNOLOGIES INC.,
26
                        Defendants.
27
28

) **RELATOR'S COMPLAINT FOR**
) **VIOLATIONS OF THE FEDERAL**
) **FALSE CLAIMS ACT, 31 U.S.C.**
) **§ 3729, *ET SEQ.***
)
) **JURY TRIAL DEMANDED**
)
) **FILED UNDER SEAL**
) **PURSUANT TO**
) **31 U.S.C. § 3730(b)(2)**
)
) **DO NOT PLACE ON PACER**
)

1
2

# Table of Contents

3    I.    SUMMARY OF THE CASE ..........................................................................1

4    II.   JURISDICTION AND VENUE..................................................................6

5    III.  THE PARTIES ..........................................................................................7

6         A.  Defendants ..........................................................................................7

7         B.  Plaintiffs.............................................................................................8

8    IV.   LEGAL AND REGULATORY FRAMEWORK .........................................9

9         A.  The False Claims Act ..........................................................................9

10        B.  FARS, DFARS, and DLA Requirements............................................12

11        C.  The Foreign Military Sales Program ...................................................16

12   V.  FACTUAL ALLEGATIONS ......................................................................18

13        A.  Background of Relevant Government Agencies...............................18

14        B.  Background of Relator ........................................................................21

15        C.  Background of PTI, VACCO, and ESCO ...........................................21

16        D.  GEA's Contracts with DOD to Produce T700 Engines ....................25

17        E.  The AISBV and Defendants' Contracts to Produce AISBVs for U.S. Military

18   Use and under the Foreign Military Sales Program ..............................29

19        F.  "Test Stands" Used to Perform Quality Control and Performance Testing...39

20        G.  Defendants Knowingly Sold and Shipped Nonconforming Parts for

21   Installation in Military Helicopters Sold to the United States and Pursuant to the

22   Foreign Military Sales Program ...........................................................43

23        1.  Defendants' Test Stands Were Incapable of, and Failed to Provide,

24   Accurate and Reliable Quality Control and Performance Testing....................43

25
26
27
28

2.   Defendants Knowingly Sold Defective AISBVs for Installation in U.S. Military Helicopters and Helicopters Sold Pursuant to the Foreign Military Sales Program ...................................................................................66

3.   Summary of Defendants' False or Fraudulent Claims................................69

H.  Defendants Retaliated Against Relator Because of Lawful Acts in Furtherance of This Action.................................................................................71

VI.   CAUSES OF ACTION...................................................................................73

COUNT ONE – FALSE OR FRAUDULENT CLAIMS UNDER FALSE CLAIMS ACT ......................................................................................................73

COUNT TWO – FALSE STATEMENTS UNDER FALSE CLAIMS ACT ......74

COUNT THREE – CONSPIRACY TO PRESENT FALSE OR FRAUDULENT CLAIMS ...........................................................................................................75

COUNT FOUR – UNJUST ENRICHMENT TO DETRIMENT OF U.S. ..........76

COUNT FIVE – PAYMENT BY MISTAKE ........................................................76

COUNT SIX – RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(H) ......77

COUNT SEVEN – RETALIATION IN VIOLATION OF CAL. LABOR CODE § 1102.5 ...............................................................................................................77

COUNT EIGHT - RETALIATION IN VIOLATION OF CAL. LABOR CODE § 98.6 ...................................................................................................................79

VII.   PRAYER FOR RELIEF .................................................................................81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RELATOR'S COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ*.**

Plaintiff, Oxnard Challenger LLC (when referencing the entity or its sole member, "Relator), on behalf of the United States of America ("United States"), brings this action against PTI Technologies Inc., VACCO Industries, and ESCO Technologies Inc. (collectively, "Defendants") for damages and civil penalties pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended. In support thereof, Relator alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.  SUMMARY OF THE CASE

1.  This case arises from intentional conduct by Defendants that resulted in the payment of false claims by the United States and deliberately exposed United States military and allied nations' aircraft—and pilots, personnel, goods, and bystanders—to grave and entirely preventable risk.

2.  For several years, under long-term exclusive contracts with GE Aviation ("GEA"), a subsidiary of General Electric Co., Defendants manufactured, supplied, and repaired—and continue to manufacture, supply and repair—Anti-Ice Starting Bleed Valves ("AISBV"), a "Flight Safety Critical Aircraft Part" used in commercial and United States and allied military aircraft worldwide.

3.    Most recently, on or about August 16, 2021, the United States Department of Defense ("DOD"), through the Defense Logistics Agency Aviation ("DLAA"), awarded Defendant PTI a $27,385,049 firm fixed-price, indefinite-delivery/indefinite-quantity contract to produce and repair AISBVs for use by the United States Army.

4.    GEA's and DOD's quality-control and testing requirements are comprehensive, requiring extensive time for performance and adding significant cost to the manufacturing process. Nonetheless, the additional time and expense incurred in the process are essential to ensure that the end product is free of defect before deployment on behalf of the United States military. As expected, DOD is not willing to risk defective aircraft engines or the potentially catastrophic consequences that could result.

5.    Lamentably, Defendants have known for several years that (a) the AISBVs that they manufacture and repair for use by or for the benefit of the United States government[1] contain latent defects, and (b) the only two Test Stands used to perform essential quality control and performance testing on AISBVs were not reliable, whereby testing measurements for valves sold to, or pursuant to a program

---

[1] As explained in detail herein, under the Arms Export Control Act, the United States government is authorized to provide defense articles or services to other friendly countries through licensed exports of direct commercial sales, the lease of defense articles, and sale of articles through the Foreign Military Sales program.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

of, the U.S. government were inaccurate, inconsistent, and failed to meet product specifications.

6.      Nonetheless, concerned about the time and money to be incurred in correcting the known defects in the Test Stands and AISBVs, Defendants intentionally shipped nonconforming AISBVs, including for use in U.S. military aircraft and for sale by the United States to allied nations through the Foreign Military Sales program, and:

- Falsified AISBV test results by tampering with the Test Stands;

- Falsely certified, among other items, that the AISBVs they supplied were in full compliance with all purchase order specifications and test requirements;

- Refused to notify stakeholders—including GEA, DOD, DLA, DLAA, and FAA[2]—of the defects or nonconformities of the AISBVs and the Test Stands, including the lack of predictability of valve performance and failure of AISBVs installed and in use in operating aircraft; and

---

[2]The Federal Aviation Administration ("FAA") is one of several modal organizations within the United States Department of Transportation, and is the largest transportation agency of the U.S. Government. FAA regulates all aspects of civil aviation in the United States and surrounding international waters. FAA's "mission is to provide the safest, most-efficient aerospace system in the world."[2] Any malfunction, defect, unapproved part, or un-airworthy conditions must be reported to the FAA.

- Knowing that it was unable to provide conforming AISBVs and perform essential product testing on AISBVs, fraudulently induced GEA and the U.S. government to enter into or continue a contractual relationship for provision and repair of AISBVs.

7.    Well aware of the nonconformities experienced with the AISBVs and Test Stands, in or about September of 2020, Defendants assigned Relator, a Senior Quality Engineer, to investigate the known malfunctions in the Test Stands. Relator promptly diagnosed various concerns including, but not limited to, inconsistent and failing test data for AISBVs, Defendants' inability to properly test and troubleshoot the AISBV product line, insufficient testing and troubleshooting documentation, and improper calibration and modification of the Test Stands. Rather than heeding Relator's professional observations and opinions, Defendants elected to ostracize and ignore Relator's findings and recommendations, and did so in an effort to generate greater profits.

8.    The problems identified by Relator constitute a serious, ongoing breakdown in Defendants' quality-control function, and pose grave hazards to human life, including lives of military service members. Notwithstanding, Defendants continue to produce and ship nonconforming AISBVs, including those destined for use in U.S. military aircraft.

9. Defendants have submitted false claims for payment, have made or used false records and certifications to obtain payment from the government, and have conspired to present or cause to be presented to the United States and its contractors, false or fraudulent claims in violation of the False Claims Act. But for Defendants' false representations to secure the contracts and their false certifications of compliance with the contracts, the United States would not have contracted with or made payment to Defendants—directly or through GEA—for the AISBVs delivered under the contracts.

10. Accordingly, pursuant to the federal False Claims Act, Relator seeks to recover, on behalf of the United States, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that Defendants caused to be submitted or conspired to submit for payments, and that Defendants knew or should have known were going to be paid ultimately by the United States government.

11. In addition, Relator brings this action in its individual capacity to recover under the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and California law, for negative employment action taken by Defendants against Relator, for which he has suffered and will continue to suffer financially, emotionally, and reputationally.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

13.    Defendants transact business in this District, and an act proscribed by 31 U.S.C. § 3729 occurred in this District. Therefore, the Court has personal jurisdiction over Defendants. Further, personal jurisdiction and venue are proper in this District pursuant to 31 U.S.C. § 3732(a), because at least one Defendant can be found, resides, or transacts business in this District, and an act proscribed by 31 U.S.C. § 3729 occurred in this District.

14.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants are subject to personal jurisdiction and transact business in this District, and a substantial part of the events or omissions giving rise to the within claims occurred in this District.

15.    Pursuant to 31 U.S.C. § 3730(b)(2), along with its submission of the original complaint in this matter, Relator prepared and has served on the Attorney General of the United States and the United States Attorney for the Central District of California written disclosures of substantially all material evidence and information currently in its possession.

16.    This action is not based upon prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing, in which the

government or its agent is a party. Relator's allegations or transactions have not been publicly disclosed in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

17.    To the extent there has been a public disclosure unknown to Relator of any of the allegations herein, Relator is the original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B).

## III.    THE PARTIES

### A.    Defendants

18.    PTI Technologies Inc. (hereinafter "PTI") is a Delaware for-profit company, with a principal place of business located at 501 Del Norte Boulevard, Oxnard, California. Upon information and belief, PTI is a subsidiary of ESCO Technologies Inc.

19.    VACCO Industries (hereinafter "VACCO") is a California for-profit corporation, with a principal place of business located at 10350 Vacco Street South, El Monte, California. Upon information and belief, VACCO is a subsidiary of ESCO Technologies Inc.

20.    ESCO Technologies Inc. (hereinafter "ESCO") is a for-profit company organized under the laws of the State of Missouri, with headquarters located at

9900A Clayton Road, St. Louis, Missouri. Upon information and belief, ESCO is the parent company to PTI and VACCO.

21. At all times relevant hereto, ESCO controlled the operations of PTI and VACCO through setting policies, procedures, incentive plans, and financial targets, and hiring and supervising management personnel and staff for PTI.

**B. Plaintiffs**

22. The United States is the real party-in-interest to the primary claims in this action, acting through the DOD, the Awarding Agency and Funding Agency for the United States Government's procurement of ASIBVs, as well as the Defense Logistics Agency ("DLA"), and the DLAA.

23. Plaintiff Oxnard Challenger LLC, a Delaware limited liability company, brings this action on behalf of itself and the United States. Its principal place of business is c/o Seeger Weiss LLP, 55 Challenger Road, Ridgefield Park, NJ 07660. Oxnard Challenger LLC is comprised of one member, an employee of PTI with personal knowledge of the fraudulent activity alleged in this Complaint, including knowledge derived from personal contact with the employees and executives of PTI, VACCO, and ESCO who have initiated and directed the violations of law alleged herein. The personal knowledge of Oxnard Challenger LLC is not distinct from that of its member.

24.    The sole member of Oxnard Challenger LLC is and, at all times relevant hereto, was a resident of the State of California and a United States citizen.

## IV.    LEGAL AND REGULATORY FRAMEWORK

### A.    The False Claims Act

25.    Designed to combat defense procurement fraud by conferring on any person the right to file a *qui tam* action against anyone who had submitted a false claim for payment to the U.S. Government, President Abraham Lincoln signed the False Claims Act into law on March 2, 1863.

26.    The modern False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing or conspiring to be presented false or fraudulent claims for payment to the United States, and for knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.[3]

27.    The FCA also imposes liability for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealing or

_____

[3] 31 U.S.C. § 3729(a)(1)(A) and (B).

knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States.[4]

28.   For purposes of the FCA, the term "knowingly" "mean[s] that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information...."[5]

29.   The FCA defines claim[6] as "any request of demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that:

   i.   Is presented to an officer, employee, or agent of the United States; or

   ii.   Is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government:

      I.   Provides or has provided any portion of the money or property requested or demanded; or

_____

[4] 31 U.S.C. § 3729(a)(1)(G).
[5] 31 U.S.C. § 3729(b)(1)(A).
[6] 31 U.S.C. § 3729(b)(2).

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

II. Will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is request or demanded.

30.    The FCA defines "material" as "having a natural tendency to influence or be capable of influencing the payment or receipt of property or money."[7]

31.    Given its remedial purposes, the FCA is interpreted broadly, and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."

32.    With respect to false claims in regard to procurement of products by the United States Government, "[t]he government does not only bargain for a certain product, it also bargains for the confidence that comes with a product that has been subjected to production testing."

33.    "Parties that contract with the government are held to the letter of the contract—irrespective of whether the contract terms appear onerous from an *ex post* perspective, or whether the contract's purpose could be effectuated in some other way—under the maxim that men must turn square corners when they deal with the government."

---

[7] 31 U.S.C. § 3729(b)(4).

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

34.     The standard of proof under the FCA is a preponderance of the evidence.[8]

35.     The FCA empowers a private person, known as a "relator," having information regarding a false or fraudulent claim against the United States Government to bring an action on the Government's behalf and to share in any recovery. The relator's complaint must be filed under seal without service on the defendant. The complaint remains under seal to give the Government an opportunity to conduct an investigation into the allegations and to determine whether to join the action.[9]

36.     Pursuant to the FCA, Relator seeks to recover, on behalf of the United States, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that Defendants caused to be submitted or conspired to submit for payments, and that Defendants knew or should have known were going to be paid ultimately by the United States Government.

**B.     FARS, DFARS, and DLA Requirements**

37.     The basic regulatory scheme for federal procurement law is contained in the federal acquisition regulations (FARs). FARs are promulgated by the United

---

[8] 31 U.S.C. § 3731(d).
[9] 31 U.S.C. § 3730.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

States Government to establish "uniform policies and procedures for acquisition by all executive agencies."[10]

38.    The purpose of FARs is to "deliver on a timely basis the best value product or services to the customer [i.e., the agency of the U.S. Government], while maintaining the public's trust and fulfilling public policy objectives."[11]

39.    FARs provide general guidance to federal contracting officers and establish prohibited practices for government contractors, but also include a substantial amount of default clauses and provisions for use in contracts between federal agencies and contractors.[12]

40.    Federal contracting officers responsible for particular contracts have some discretion as to which clauses and provisions will be included in the contract, but are expressly forbidden from modifying clauses and provisions except where authorized by the FARs.[13]

41.    By way of examples, a federal contractor must comply with FAR 52.246-2, which requires that "[t]he Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the Government for acceptance only supplies that have

---

[10] 48 C.F.R. § 1.101.
[11] 48 C.F.R. § 1.102(a).
[12] 48 C.F.R. §§52.100, *et seq.*
[13] 48 C.F.R. § 52.104(a).

– 13 –
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome." Supplies are defined as including "raw materials, components, intermediate assemblies, end products, and lots of supplies." This FAR further specifies that "Supplies are nonconforming when they are defective in material or workmanship or are otherwise not in conformity with contract requirements."

42. In addition to FARs, the various executive agencies have their own acquisition regulations, to include what regulations are required to implement or supplement the FARs to meet the specific needs of the agency.

43. The Defense Federal Acquisition Regulation Supplement ("DFARS") is administered by the DOD. The DFARS implements and supplements FAR, and contains requirements of law, DOD-wide policies, delegations of FAR authorities, deviations from FARs requirements, and policies and procedures that have a significant effect on the public. The DFARS should be read in conjunction with the primary set of rules in FARs.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

44.      Pursuant to DFARS 252.246-7003,[14] by contract, a federal contractor must provide notification to the Government "as soon as practicable, but not later than 72 hours, after discovering or acquiring credible information concerning":

     a.   Nonconformances for parts under the contract identified as critical safety items acquired by the Government under the contract; or

     b.   Nonconformances or deficiencies that may result in a safety impact for systems, or subsystems, assemblies, or parts integral to a system, acquired by or services for the Government under the contract.

45.      Required notice of such nonconformances or deficiencies must include a summary of the defect or nonconformance, a chronology of pertinent events, the identification of potentially affected items to the extent known at the time of notification, a point of contact to coordinate problem analysis and resolution, and any other relevant information.[15]

46.      As the recipients of contracts with the DOD, Defendants entered into contracts with the DOD through the DLAA that incorporated many of the provisions and clauses set forth in FARs, as well as several supplemental terms and provisions set forth in the DFARS.

---

[14] *See* 48 C.F.R. 252.246-7003(b) and (c).
[15] *See* 48 C.F.R. 252.246-7003(c).

47.     Among other requirements of DLA, the Defense Logistics Acquisition Directive (DLAD) promulgated by DLA imposes obligations upon contractors contracting with DLA, including pursuant to DLAD 46.105 the requirement that contractors "maintain calibrated measuring and test equipment used for test and verification of products offered."

48.     As a federal contractor, Defendants' right to payment was expressly conditioned on it adherence to the contract's terms and requirements.

**C.    The Foreign Military Sales Program**

49.     DOD's Foreign Military Sales program facilitates sales of U.S. arms, defense equipment, defense services, and military training to foreign governments.

50.     The Foreign Military Sales program is a form of security assistance authorized by the Arms Export Control Act (AECA), as amended. In implementing the Foreign Military Sales program, the United States Congress recognized that:

> [I]t remains the policy of the United States to facilitate the common defense by entering into international arrangements with friendly countries which further the objective of applying agreed resources of each country to programs and projects of cooperative exchange of data, research, development, production, procurement, and logistics support to achieve specific national defense requirements and objectives of mutual concern. To this end, this chapter authorizes sales by the United States Government to friendly countries having sufficient wealth to maintain and equip their own military forces to adequate strength, or to assume progressively larger shares of the costs thereof, without undue burden to their economies, in

accordance with the restraints and control measures specified herein and in furtherance of the security objectives of the United States and of the purposes and principles of the United Nations Charter.[16]

51.    Accordingly, under the Foreign Military Sales program, defense articles and defense services may be sold or leased by the United States government to friendly countries for internal security, for legitimate self-defense, for preventing or hindering the proliferation of weapons of mass destruction and of the means of delivering such weapons, to permit the recipient country to participate in regional or collective arrangements or measures consistent with the Charter of the United Nations, or otherwise permit the recipient country to participate in collective measures requested by the United Nations for the purpose of maintaining or restoring international peace and security, or for the purpose of enabling foreign military forces in less developed friendly countries to construct public works and to engage in other activities helpful to the economic and social development of such friendly countries.[17]

52.    The Foreign Military Sales program is a "fundamental tool of U.S. foreign policy."[18]

_____

[16] 22 U.S.C. § 2751.
[17] 22 U.S.C. § 2754.
[18] Foreign Military Sales (FMS) | Defense Security Cooperation Agency (dsca.mil)

– 17 –
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

53.    Foreign Military Sales are implemented by the DOD, and the FARs and DFARS apply to all programs.

54.    In addition to Foreign Military Sales, AECA authorizes the United States to provide defense articles or services to other friendly countries through licensed exports of direct commercial sales and the lease of defense articles.

## V.    FACTUAL ALLEGATIONS

### A.    Background of Relevant Government Agencies

55.    The DOD is the United States' largest government agency.[19]

56.    With a national defense budget of $752.9 billion,[20] "[t]he mission of the DOD is to provide the military forces needed to deter war and to protect the security of our country."[21]

57.    The Secretary of Defense oversees DOD and acts as the principal defense policymaker and adviser.

58.    As the nation's combat logistics support agency, DLA manages the end-to-end global defense supply chain—from raw materials to end user

---

[19] About (defense.gov)
[20] *Id.*
[21] https://www.usaspending.gov/agency/department-of-defense?fy=2022

disposition—for the five military services, 11 combatant commands,[22] other federal, state and local agencies, and partner and allied nations.[23]

59.    DLA's mission is to "deliver readiness and lethality to the Warfighter Always and support our nation through quality, proactive global logistics." To accomplish this mission, DLA has a staff of about 26,000 employees divided into multiple supply chains that contract for material and services across the military classes of supply, to include: subsistence (food and water), clothing and textiles, bulk petroleum and other energy products, construction material and equipment, personal demand items, medical material and equipment, and repair parts for land, sea and air systems.[24]

60.    As a logistics integrator and acquisition/service provider, DLA procures items from manufacturers and suppliers and provides them to DOD and other federal and state customers,[25] with services such as warehousing, packaging, and transportation. DLA also contracts for items that are shipped directly by the manufacturer to military units and installations, and disposes of excess military

---

[22] The combatant commands include Africa Command, Central Command, Cyber Command, European Command, Indo-Pacific Command, Northern Command, Southern Command, Space Command, Special Operations Command, Strategic Command, and Transportation Command. Combatant Commands (defense.gov)
[23] About the Defense Logistics Agency (dla.mil)
[24] Id.
[25] DLA procures more than $41.8 billion in goods and services annually on behalf of its customers.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

property through reutilization, resale and demilitarization programs. DLA supports a worldwide warehouse and distribution services network, logistics and staff planning support to DOD's combatant commands, and operations that reutilize or dispose of excess material and environmental waste from the military services.[26]

61.    Reporting to the DLA Director are six major subordinate commands, including the DLAA, a major subordinate command of DLA. DLAA[27] is the aviation demand and supply chain manager for DLA and much of the DOD.[28]

62.    Employing more than 4,000 civilian and military personnel in 18 locations across the United States, DLAA supports more than 1,879 weapon systems and is the U.S. military's integrated material manager for more than 1.7 million national stock number items,[29] industrial retail supply and depot-level repairable acquisitions. "DLAA plays a pivotal role in supporting the U.S. Army, Air Force,

---

[26] About the Defense Logistics Agency (dla.mil)
[27] In 2010, the name of the aviation supply and demand chain changed from Defense Supply Center Richmond to DLA Aviation, better representing the supply chain's core mission.
[28] Newsletter 1 (dla.mil)
[29] A National Stock Number is the official label applied to each item repeatedly used, bought, stocked, or distributed by DOD. When a NSN is assigned to an item, data is assembled to describe that item. Some data elements include information such as an item name, manufacturer's part number, unit price, and physical and performance characteristics. NSNs are an essential part of the DOD Supply Chain used in acquisition, managing, moving, storing, and disposal of material.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

Marine Corps, Navy, and Space Force services by providing targeted solutions and full-spectrum logistics support."[30]

63.    DLAA supports the following nine major product lines: engines and airframes; instrumentation, gauges, and electrical hardware; chemicals and petroleum products; green products; industrial gases and cylinders; ozone depleting substances; topographic; hydrographic, aeronautical maps and charts (digital and print) and industrial plant equipment services.[31]

**B.    Background of Relator**

64.    Relator began working for PTI in July of 2020 and, at all times relevant hereto, was employed by PTI as a Senior Quality Engineer MRO.[32]

65.    Relator has been working in the aerospace industry for 28 years. Relator has extensive experience and knowledge in regard to product testing and quality control on aerospace parts.

**C.    Background of PTI, VACCO, and ESCO**

66.    PTI states on its website that it "is a world leader in the design, development, manufacture, marketing and distribution of highly engineered filtration and fluid control subsystems and equipment for mission-critical operations."

---

[30] DLA Aviation Home
[31] Id.
[32] "MRO" refers to "maintenance, repair, and overhaul."

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

67.    PTI states further on its website:[33]

Experience & Dedicated Support. With over 85 years of
engineering, development and manufacturing experience,
PTI is in a position to provide innovative, cost effective,
and advanced products and system solutions for virtually
any filtration & fluid flow application. The level of
technical sales support and repair services at PTI are
unsurpassed. Our engineers serve on industry committees
including, SAE International (SAE), National Fluid Power
Association (NFPA), and International Standards
Organization (ISO).

Products & Engineering Services. PTI's product lines
serve a worldwide customer base in a wide range of
markets. These include: agriculture; automotive
manufacturing; chemical and petrochemical production;
commercial and military air, sea and land-based vehicles
and equipment; construction & off-highway vehicles;
lumber production; machine tool manufacturing; metal
manufacturing; mining; nuclear and hazardous waste
disposal; oil and gas production; petroleum production;
power generation; and pulp and paper manufacturing.

68.    In regard to its "test capabilities" and laboratory, PTI states on its
website:

PTI maintains a state-of-the-art test lab that specializes in
the development and performance verification of filtration
systems and related technologies. Unique test stands and
standard set-ups are used to complete a variety of rating
and performance integrity tests to the requirements of
MIL-F-8815. The testing facility is also capable of
satisfying unique customer specifications. Systems can be
evaluated in either synthetic or petroleum based hydraulic
oils, fuels, air and/or water.

---

[33] https://www.ptitechnologies.com/about/capabilities/

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

69.     According to VACCO's website:[34]

For more than 68 years, VACCO has been serving the
defense, space and commercial markets with extensive
engineering experience and continuous collaboration.

From the unforgiving conditions of the deep seas to the
demanding elements of deep space, VACCO supports
many of the world's critical programs and platforms for
aircraft, filtration, navy and space with our guiding values:

- Innovative solutions
- World-class quality products
- Premier Customer Service
- On-time delivery
- Competitive price

70.     VACCO states on its website that it "is a leading designer and
manufacturer of specialty valves, filters and advanced fluid control products—
offering innovative engineered solutions to critical missions for defense, space, and
commercial markets."

71.     As to its "quality policy," VACCO states at its website that it "is
committed to" (a) "[d]esigning and manufacturing high-quality, cutting-edge
products which meets all customer requirements in a timely manner while
continually improving our processes to enhance customer loyalty and satisfaction,"

---

[34] VACCO : About - About

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

and (b) "[p]romoting a Quality Management System which holds each employee accountable, ensures continual improvement, and maintains compliance."

72.    ESCO states on its website[35] that it "was spun off from Emerson Electric Co. in October of 1990" and "is a global provider of highly-engineered products and solutions to diverse and growing end-markets that include the aerospace, defense, space, healthcare, wireless, consumer electronics, electric utility, and renewable energy industries."

73.    ESCO stated in its November 2021 Form 10-k filed with the United States Securities and Exchange Commission that it is "[a] global provider of highly engineered filtration and fluid control products and integrated propulsion systems for the aviation, navy, space and process markets worldwide, as well as composite-products and solutions for navy, defense and industrial customers."

74.    ESCO further states in its 10-K that "[o]ur business is focused on generating predictable and profitable long-term growth through continued innovation and expansion of our product offerings across each of our business segments. We conduct our business through a number of wholly-owned direct and indirect subsidiaries."

---

[35] Home - ESCO Technologies

**D.    GEA's Contracts with DOD to Produce T700 Engines**

75.    The General Electric T700/CT7 turboshaft engine is used for both commercial and military applications, including incorporation into the engine of the UH-60 Black Hawk[36] and AH-64 Apache[37] helicopters. Specifically, GEA's T700 engine is used in various helicopter models, including:

- T700-401C/701C, used in Sikorsky H-60 Black Hawk helicopters and Army's Boeing AH-64 Longbow Apache

- T700-701D, Sikorsky UH-60 Black Hawk and AH-64E Apache

- T700/T6A, EH101 used by the Canadian Department of National Defense Force and the Italian Navy

- T700-701K, used in the South Korean Helicopter Program

---

[36] The UH-60 Black Hawk helicopter is the U.S. Army's primary medium-lift utility transport, intended to serve in utility, air assault, medevac, command and control, and reconnaissance roles. It is a twin-engine medium-lift utility helicopter. The basis crew complement for the UH-60A is three—pilot, co-pilot, and crew chief—and it was designed to carry 11 combat troops in addition to the crew. UH-60A/L Black Hawk Helicopter | Military.com

[37] The Boeing AH-64 Apache is a twin-turboshaft helicopter with a tailwheel-type landing gear arrangement and a tandem cockpit for two. The Apache AH-64 "represents the backbone of the U.S. Army Attack helicopter fleet and a growing number of international defense forces," and has a "reputation as the world's most advanced and proven attack helicopter." "With the AH-64E in production until at least 2028, the Apache will serve the U.S. Army and its partner nations as the world's primary attack helicopter into the 2060s." Boeing: AH-64 Apache

76.    Developed for the U.S. Army to overcome the many shortcomings of 1960s-era helicopter engines experienced in Southeast Asia, the T700/CT7 turboshaft engine was designed to operate reliably in any environment and be easily maintained.

77.    Versions of GEA's T700 are also utilized by local government entities—including, but not limited to, the Department of Forestry and Fire Protection, the Los Angeles County Fire Department, and the City of San Diego Fire-Rescue Department—for non-military use including firefighting, rescue, external lift and medical evacuation. One such model is the Firehawk, a modified Black Hawk UH-60 helicopter powered by a pair of T700-701D engines, which can carry 1,000 gallons of water and fly near intense fires that cause huge temperature swings.[38]

78.    As depicted in GEA marketing material,[39] the following is a picture of the T700:



---

[38] T700 Turboshaft Engine | GE Aviation
[39] https://www.geaviation.com/propulsion/military/t700

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

79.    The United States government has awarded GEA several contracts for the production of T700 engines including, but not limited to, the following:

- In or about May of 2015, GEA was awarded a $2,001,101,104 firm-fixed-price indefinite-delivery/indefinite-quantity contract from DOD, No. W58RGZ-15-D-0048, for the T700 701D/401C engine in support of Army, Navy, Air Force, Foreign Military Sales and other government agency requirements. This DOD contract in part fulfilled a Foreign Military Sale to Taiwan for Taiwan's purchase through FMS of UH-60 Black Hawk helicopters.

- In or about December of 2019, the U.S. Army awarded GEA an indefinite-delivery/indefinite-quantity contract for the continued production of T700 turboshaft engines in support of Army, Navy, Air Force, Marines, Coast Guard, Foreign Military Sales and other government agency programs through 2024.

- In or about September of 2021, GEA secured a nearly $284 million firm-fixed-price, requirements-type contract with DLA to provide T700 engines to power military helicopters used in air rescue, medical evacuation, marine patrol, transport and special operations missions.

80.    On or about November 23, 2021, GEA issued a press release in regard to its two September 2021 contracts with DLA to support T700 turboshaft engine

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

fleets across the U.S. military,[40] wherein Harry Nahatis, GEA's vice president and general manager of GE Turboshaft Engine programs, stated "the T700 engine is the heart of medium lift helicopter fleets across the U.S. military, and we're proud to continue supporting multiple U.S. service branches through this contract. Readiness and cost are two major focuses for GE and the Department of Defense, and this contract allows us to continue improving on both fronts."

81.    In addition to use by the United States government, GEA has sold and continues to sell its T700 engine via the Foreign Military Sales program, which consists of Defendants' AISBV as a flight safety critical component part. Upon information and belief, friendly governments who have received or are expected to acquire these defense products through the United States government include, but are not limited to, Jordan, Australia, Taiwan, Italy, Canada, Japan, Qatar, South Korea, Denmark, Pakistan, Saudi Arabia, Israel, Czech Republic, Mexico, Bahrain, Greece, Philippines, and Nigeria.

---

[40] GE awarded two contracts supporting T700 engine fleets across U.S. military | GE Aviation

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

**E.    The AISBV and Defendants' Contracts to Produce AISBVs for
U.S. Military Use and under the Foreign Military Sales Program**

82.    For several years, under long-term exclusive contracts with GEA,[41] Defendants have manufactured and repaired AISBVs to support GEA's T700 turboshaft engine for commercial and military applications.

83.    The AISBV controls the flow of anti-icing and start bleed air from the compressor bleed port of the aircraft engine. The AISBV provides hot air flow for engine anti-ice protection and automatically bleeds air from the engine during the starting cycle. As explained below, the AISBV is classified as "Flight Safety Critical," and there is no backup system in the event the AISBV fails during a flight or mission.

84.    The AISBV is an essential component of the T700/CT7 turboshaft engine. Defendants' AISBV support the GEA T700 turboshaft engine in both commercial and military applications, including incorporation into the engine of the UH-60 Black Hawk and AH-64 Apache helicopters, for which PTI currently manufactures and repairs AISBVs for use in these and other models.

85.    GEA imposes numerous contractual obligations on a subcontractor or supplier such as PTI, including the following:

---

[41] PTI also sells and repairs AISBVs for many other customers, including Loganair Limited, VACCO Industries, and StandardAero, for military and commercial applications.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

- The subcontractor/supplier is required to have a system in place to evaluate their measurement and test equipment through Measurement Systems Analysis (MSA),[42] which is to ensure that the measurement and test equipment utilized effectively evaluates part characteristics.

- The subcontractor/supplier is required to document and promptly notify GEA of any nonconformance in the supplied product.

- Equipment used to monitor and measure or test product or process conformity must be properly calibrated and verified at intervals necessary to assure continued accuracy, with all reference standards used in calibration required to be traceable back to National Standards.

- The subcontractor/supplier must act in a manner consistent with GEA's Integrity Guide which requires, among other obligations and especially if related to a U.S. government contract, that the subcontractor/supplier promptly report any concern affecting GEA to GEA as soon as the subcontractor/supplier has knowledge of the concern.

86.    As depicted in PTI marketing material, the following is a picture of the AISBV it currently uses in the T700/CT7 turboshaft engine:

---

[42] The purpose in conducting a MSA is to estimate the variation in the measurement system. Once quantified, it can determine if the level of variation can be tolerated or if actions must be taken to improve the measurement system or control effects of this variation.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL



87.     PTI manufactures and repairs AISBVs under PTI Part Numbers 73340
and 82880. The 73340 product line—consisting of Part Numbers 73340-21, 73340-
22, and 73340-23, which remain in production by PTI, and Part Numbers 73340-17,
73340-18, and 73340-20, which are no longer produced but continue to be repaired
by PTI—fundamentally performs the same way. Upon information and belief, Part
Numbers 73340-17, 73340-20, and 73340-23 are used primarily in military
applications.

88.     Prior to ESCO's transfer of AISBV production and repairs to subsidiary
PTI, ESCO's subsidiary VACCO manufactured and repaired AISBVs under Part
Numbers 73340 and 82880.

89.     In addition to its long-term exclusive contract with GEA, Defendants
have received numerous awards from the United States government and, through the

Foreign Military Sales program or as otherwise authorized by AECA, foreign governments for the production and repair of AISBVs.

90.    For example, on or about August of 2010, VACCO was awarded a five-year contract worth up to $35 million to supply anti-icing valves for use on U.S. Army UH-60 series Black Hawk helicopters. According to a press release issued by ESCO on August 5, 2010,[43] "[t]he initial purchase order for $2.5 million was received on this contract with product deliveries expected to begin in fiscal 2011." Further, the press release quoted VACCO President to say:

> We are very pleased to be selected once again to supply these critical valves to our nation's armed services. Our success in providing large quantities of this high-quality valve over the years put us in a great position to win this competitively bid contract. The Army's actions further validate our many years of successful engineering development, production of superior quality hardware, and dedicated service to our long-term customers. In addition, this sizable project is anticipated to add strength and long-term stability to our operating forecast.

91.    On or about August 16, 2021,[44] the U.S. Government, through DLA, awarded PTI a $27,385,049 firm fixed-price, indefinite-delivery/indefinite-quantity contract[45] for PTI to produce AISBVs to be used by the U.S. Army, a sole-source

---

[43] ESCO Announces $35 Million T-700 Contract Award at VACCO (prnewswire.com)
[44] > U.S. Department of Defense > Contract
[45] As explained at usaspending.gov, "an indefinite Quantity Contract for supplies (not services) is sometimes referred to as a Delivery Order Contract. With this type

acquisition using justification 10 U.S. Code 2304(c)(1), as stated in FAR 6.302-1. The contract was for a period of five years with no option periods.

92.    On September 21, 2021, PTI announced that it had been awarded a "major contract from Defense Logistics Agency Aviation." According to its press release[46] issued on that date:



*Oxnard California* - 21 September 2021 - PTI Technologies announced they have been awarded an indefinite-delivery/indefinite-quantity contract for Anti-Ice Starting Bleed Valves (AISBV), a dual functioning modulating poppet valve for gas turbine engines by the Defense Logistics Agency Aviation, Redstone Arsenal. The AISBV controls the hot air flow for anti-ice protection and automatically bleeds air from the engine during the starting cycle for the GE T700, the turboshaft engine powering the UH-60 Black Hawk and the AH-64 Apache aircraft. "PTI is pleased to receive this IDIQ Contract from

of contract, the government promises to buy supplies over a period of time from a vendor. Instead of an exact amount, it sets a quantity range with a minimum and maximum."

[46] https://www.ptitechnologies.com/dla-major-contract-award/

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

Defense Logistics Agency Aviation, Redstone Arsenal in support of these vital U.S. Army aircraft programs," said Rowland Ellis, President of PTI Technologies. "This is a significant achievement for our Military Business and I am proud of our continued dedication and capability to manufacture high reliability products that keep our armed forces safe during mission-critical operations." This contract allows PTI to provide tailored support as a sole-source supplier under justification 10 U.S. Code 2304(c)(1), as stated in Federal Acquisition Regulation 6.302-1 for the next five years. With this award and other filtration and fluid control subsystems actively being consumed, PTI continues to provide value-added solutions to the Defense Logistics Agency.

93.     DOD is the Awarding Agency and Funding Agency for the government's procurement of ASIBVs under the 2021 contract, Procurement Instrument Identifier SPRRA121D0025.[47] The Awarding Sub-Agency and Funding Sub-Agency for the 2021 contract is DLA, and the Awarding Office is DLAA.[48]

94.     The "obligated amount" under the contract—the amount of money that the DOD has promised to pay to PTI—is $4,235,501. The potential award amount—the amount that could be obligated on the contract—is $27,385,048.60. Upon information and belief, 100% of the funds PTI receives originate from the federal account titled "Department of Defense Working Capital Fund, Defense."[49]

---

[47]https://www.usaspending.gov/award/CONT_IDV_SPRRA121D0025_9700
[48]https://www.usaspending.gov/award/CONT_IDV_SPRRA121D0025_9700
[49]https://www.usaspending.gov/award/CONT_IDV_SPRRA121D0025_9700

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

95.    Upon information and belief, PTI's recent contract with DOD incorporates FARs and DFARS provisions that require PTI to test the AISBVs, to certify that the part conformed to the contract upon submission for payment to the U.S. Government and to report and correct contractual noncompliance.

96.    Upon information and belief, VACCO's contracts with DOD incorporated FARs and DFARS provisions that required VACCO to test the AISBVs, to certify that the part conformed to the contract upon submission for payment to the U.S. Government, and to report and correct contractual noncompliance.

97.    Per U.S. Army requirements and Defendants' contracts, including the August 2021 contract with the U.S. Government, the AISBV is defined as "Flight Safety Critical"[50] under the Flight Safety Critical Aircraft Parts Program (FSCAP), defined as "a part, assembly or installation procedure with one or more critical characteristics that, if not conforming to the design data or quality requirements, could result in serious injury or death of crew members and/or serious damage to the helicopter or aircraft." A "critical characteristic is any dimension, tolerance, finish, material, manufacturing, assembly or inspection process, or other feature which, if

---

[50] Upon information and belief, the AISBV is also classified as "Mission Critical," defined as a part whose failure or disruption would cause an entire military mission to fail.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

nonconforming or missing could cause failure or malfunction of this Flight Safety Critical part. No deviation is allowed on a critical characteristic." Additionally, "[t]he acceptance test procedure for the AISBV is flight safety critical."

98.    A copy of the DMWR 55-2995-231 Depot Maintenance Work Requirement for the AISBVs, produced and distributed by the United States Army Aviation and Missile Command, is depicted below:

DMWR 55-2995-231
A1-454CA-MDB-300

**1-3.1. Depot Mobilization Requirements.** In the event of mobilization, all depot maintenance overhaul/repair procedure requirements, except those necessary to return the end item, assembly, subassembly or component to a serviceable condition, are to be exempt or revised. The exceptions/revisions are identified in Appendix D. The appendix is provided by the procuring activity maintenance engineering group.

**1-3.2. Flight Safety Critical Aircraft Parts Program (FSCAP).** Parts, assemblies or installations identified under the FSCAP program require special handling during overhaul. Throughout the overhaul procedures, warnings will appear emphasizing critical instructions to be followed. These warnings are identified as FSCAP warnings and will be inserted whenever necessary.

a. A FSCAP part is defined as a part, assembly or installation procedure with one or more critical characteristics that, if not conforming to the design data or

quality requirements, could result in serious injury or death of crew members and/or serious damage to the helicopter or aircraft. It should be noted that references to the Flight Safety Parts (FSP) Program or Flight Safety Critical Aircraft Parts (FSCAP) Program are interchangeable. The FSP Program is the predecessor of the FSCAP Program. The FSP Program was instituted solely within the Army; the FSCAP Program is instituted throughout the Department of Defense.

b. A critical characteristic is any dimension, tolerance, finish, material, manufacturing, assembly or inspection process, or other feature which, if nonforming or missing could cause failure or malfunction of the FSCAP. No deviation is allowed on a critical characteristic.

c. The anti-icing bleed and start valve is identified as a FSCAP. The acceptance test procedure is flight safety critical (table 1-0).

*Table 1-0. Flight Safety Critical Aircraft Parts (FSCAP)*

| Nomenclature | Part Number | National Stock Number | Critical Characteristic |
|---|---|---|---|
| Anti-Icing Bleed and Start Valve | 4046T28G03 | 2995-01-120-8713 | Acceptance Test (Chapter 4) |
| | 4046T28G05 | 2995-01-134-7264 | |
| | 4046T28G06 | 2995-01-147-2940 | |
| | 4046T28G14 | 2995-01-294-9867 | |
| | 4046T28G15 | 2995-01-313-0691 | |
| | 4046T28G16 | 2995-01-309-1391 | |

99.    At all times relevant hereto, Defendants were aware that the AISBVs are categorized as Flight Safety Critical. Notwithstanding, Defendants intentionally

or with reckless disregard ignored the Flight-Safety-Critical designation, DOD's Standard Practice for System Safety, and other requirements and guidance for the proper production, repair, and testing of AISBVs.

100.   Upon information and belief, within the past two years alone, over 120 AISBVs (primarily Part Number 73340-23) have been sold and shipped to the United States or to contractors, such as GEA, for installation in UH-60 Black Hawk and AH-64 Apache helicopters sold to the United States, state and local government entities, and foreign governments pursuant to the Foreign Military Sales program or as otherwise authorized by AECA.

101.   The following is a photograph of a sales order chart maintained by PTI to document new AISBVs with Part Number 73340-23 produced and shipped by PTI from December of 2020 to January of 2022:

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Item | Transaction Date | Transaction Type | Source Type | Source | Transaction Quantity | Transaction UOM |
| 2 | 73340-23 | 1/26/2022 15:54 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 3 | 73340-23 | 1/26/2022 15:54 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 4 | 73340-23 | 1/26/2022 15:53 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | +1 | Ea |
| 5 | 73340-23 | 1/26/2022 15:53 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 6 | 73340-23 | 1/26/2022 15:52 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 7 | 73340-23 | 1/26/2022 15:45 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -3 | Ea |
| 8 | 73340-23 | 1/26/2022 15:45 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 9 | 73340-23 | 5/24/2021 15:54 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 10 | 73340-23 | 3/30/2021 8:42 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 11 | 73340-23 | 3/30/2021 8:42 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -3 | Ea |
| 12 | 73340-23 | 3/29/2021 15:28 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 13 | 73340-23 | 3/2/2021 16:05 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 14 | 73340-23 | 3/2/2021 16:05 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 15 | 73340-23 | 3/2/2021 16:05 | Sales order issue | Sales order | 2040676.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 16 | 73340-23 | 3/2/2021 16:04 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -3 | Ea |
| 17 | 73340-23 | 2/22/2021 15:47 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -22 | Ea |
| 18 | 73340-23 | 2/9/2021 15:58 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -8 | Ea |
| 19 | 73340-23 | 1/29/2021 10:07 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -20 | Ea |
| 20 | 73340-23 | 1/28/2021 12:38 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -13 | Ea |
| 21 | 73340-23 | 1/25/2021 16:07 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -7 | Ea |
| 22 | 73340-23 | 12/22/2020 14:59 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 23 | 73340-23 | 12/22/2020 14:59 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 24 | 73340-23 | 12/22/2020 14:58 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 25 | 73340-23 | 12/22/2020 14:58 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -5 | Ea |
| 26 | 73340-23 | 12/14/2020 15:55 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -5 | Ea |
| 27 | 73340-23 | 12/14/2020 15:54 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -2 | Ea |
| 28 | 73340-23 | 12/14/2020 15:54 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 29 | 73340-23 | 12/14/2020 15:54 | Sales order issue | Sales order | 904577.RMA Order.ORDER ENTRY | -1 | Ea |
| 30 | 73340-23 | 12/14/2020 15:53 | Sales order issue | Sales order | 904801.RMA Order.ORDER ENTRY | -1 | Ea |
| 31 | 73340-23 | 12/14/2020 15:50 | Sales order issue | Sales order | 2039574.Standard Sales Order.ORDER ENTRY | -1 | Ea |
| 32 | | | | | | -118 | |

102.   Upon information and belief, each packing slip used for PTI's delivery of an ordered AISBV includes a certification, executed with a "quality assurance signature" by a representative of PTI, stating:

> ALL ITEMS FURNISHED WITH THIS SHIPMENT ARE IN FULL COMPLIANCE WITH ALL PURCHASE ORDER SPECIFICATIONS AND TEST REQUIREMENTS. TEST REPORTS COVERING ALL THE MATERIAL AND PROCESSING ARE ON FILE AND ARE AVAILABLE FOR REVIEW FOR THE DURATION REQUIRED BY THE PURCHASE ORDER/CONTRACT.

– 38 –
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

103.   Upon information and belief, prior to ESCO's transfer of production and maintenance of AISBVs to PTI from VACCO, VACCO was required to execute a substantially similar (or identical) certification of quality assurance.

104.   Per PTI's Production Part Approval Process, "<u>PTI is primarily concerned that the material is confirmed and that the acceptable performance is demonstrated.</u> If there is a performance requirement make sure the results of the testing are acceptable, credible and performed to the specification." [emphasis in original]

**F.    "Test Stands" Used to Perform Quality Control and Performance Testing**

105.   Two separate Test Stands—a Flow Test and a Force Margin Test—are required and utilized at PTI's "T700 Lab," the laboratory used at the PTI facility for quality control and performance testing of new and repaired AISBVs for both AISBV variants, 73340 and 82880.

106.   At all times relevant hereto, Defendants maintained and used only one Flow Test Stand and only one Force Margin Test Stand.

107.   The Force Margin test is performed on the Forge Margin Test Stand, and is used to verify the mechanical force required to actuate the AISBV in both closing and opening directions. Upon information and belief, the Force Margin Test Stand is owned by the United States Army.

– 39 –

108.  Photographs depicting the Force Margin Test Stand are immediately below:





1    109.   The Flow Test is performed on the Flow Test Stand, and verifies proper

2   functioning of the anti-ice and bleed-flow characteristics of the AISBV. Upon

3   information and belief, the Flow Test Stand is owned by General Electric.

4

5    110.   Photographs depicting the Flow Test Stand are immediately below:







111.    In late 2019, the Force Margin Test Stand and the Flow Test Stand used for quality control and performance testing of Defendants' AISBVs were transferred by ESCO from the VACCO facility to PTI's facility in Oxnard, California.

112.    Prior to the transfer to the Oxnard, California facility, VACCO utilized the same Force Margin Test Stand and the Flow Test Stand for quality control and performance testing of AISBVs shipped for use by U.S. military aircraft, state and local government aircraft, and foreign military aircraft as authorized under AECA.

113.    Upon information and belief, the Test Stands were not re-qualified, calibrated, or subjected to any industry-standard assessment at the time of transfer by ESCO to PTI's facility in Oxnard, California.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

### G.  Defendants Knowingly Sold and Shipped Nonconforming Parts for Installation in Military Helicopters Sold to the United States and Pursuant to the Foreign Military Sales Program

#### 1.  Defendants' Test Stands Were Incapable of, and Failed to Provide, Accurate and Reliable Quality Control and Performance Testing

114.   In or about September of 2020, Relator was assigned to PTI's T700 Lab, the testing station conducting quality control and performance testing for the AISBVs manufactured by PTI.

115.   Soon after receiving the assignment, Relator discovered that the Flow Test readings for AISBVs that were obtained for total and primary flow values were outside of the tolerance range set forth in specification requirements, while flow test variation was consistently observed during flow testing for both AISBV variants (82880 and 73340). In other words, when AISBVs were tested, measurements obtained by the Flow Test Stand were both inconsistent and often failed to meet product requirements.

116.   Relator was extremely concerned about the variability in testing data, regardless of the source, and promptly notified PTI representatives. Either the Test Stand was producing inaccurate and inconsistent measurements or the AISBVs themselves were not achieving satisfactory testing results—under either scenario, conformity was not demonstrated for this Flight Safety Critical-designated part being utilized in commercial and United States military aircraft.

117.    Relator determined at the outset of its review that the testing problem being experienced was a "test stand issue," which Relator attributed to the inconsistent data produced by the Flow Test Stand. In reaching this conclusion, Relator considered the possibility of various sources for variability in the test results, including the Flow Test Stand, the hardware including the test fixture (T13-0135) and the AISBV unit under test, operator error (technician mistakes),[51] and a flawed process (the testing steps).

118.    Nonetheless, without performance of accurate and consistent testing, and without documented satisfactory test results, nonconforming AISBVs were improperly designated as acceptable and then shipped for installation in helicopters sold to the United States, state and local governments, and/or through the Foreign Military Sales program, directly or through contractors such as GEA.

119.    By e-mail of September 29, 2020, Relator confirmed to PTI representatives its evaluation that the testing fluctuation issues being experienced were not with the AISBV unit but, rather, were being caused by an inconsistent test stand, possibly being caused by debris, dust or contamination. Relator recommended at that time that the "test stand lines be cleared."

---

[51] In considering the possibility of technician error, Relator concluded that because the test technician had tested the product for over twenty years, this was not reasonably likely to be the cause.

120.    In an effort to explain the fluctuating AISBV measurements being produced by the test stand, the PTI team utilized what they referred to as the "golden unit," a master AISBV unit known to meet all requirements. In theory, if the "golden unit" measured appropriately on the test stand, PTI would then know that the testing-fluctuations issue was being caused by deficiencies in the AISBV units themselves; on the other hand, if the "golden unit" failed in testing, PTI would be able to deduce that the testing issue was being caused by defects in the test stand.[52]

121.    Below is a photograph of the "golden unit" (a/k/a "golden valve"):



---

[52] As explained herein, the "golden unit" system of calibration is not scientifically reliable in that it does not demonstrate both accuracy and precision, which are two independent ways to consider error. By way of explanation, it is possible to be precise but not accurate, or vice versa. A classic way to explain the difference is by visualizing a dartboard, with the bulls-eye being the desired value: if the darts are neither close to the bulls-eye nor close to each other, there is neither accuracy nor precision; if all darts land very close together, but far from the bulls-eye, there is precision but not accuracy; if the darts are all about an equal distance from and spaced equally around the bulls-eye, there is accuracy but not precision; if the darts land close to the bulls-eye and close together, there is both accuracy and precision.

122. As of October 8, 2020, the "golden unit" had also failed testing on PTI's test stand.

123. By e-mail of October 12, 2020, Relator explained to PTI representatives, that the issue with the test stand was "a unique challenge for sure" and they should "gather more data and proceed forward." At or about that time, Relator offered to its supervisor to take the "golden valve" to GEA's facility in Minneapolis to validate proper functioning of the golden valve at the system level, but PTI did not respond to Relator's offer.

124. As of October 13, 2020, a team led by Relator was continuing to experience fluctuations in readings produced by the AISBV test stands, and by e-mail of same date, Relator noted that the team was taking "baby steps" in an effort to solve the problems being experienced with the test stands. Further, Relator "hypothesized that due to potential issues with the test stand, the operator is switching out parts in the units to perhaps compensate for test stand characteristic deficiencies"—in other words, PTI had been recklessly tampering with the AISBV until the apparently capricious test stand produced a "passing" result to enable shipment.

125. As of October 20, 2020, the AISBV investigation team consisted of Relator, Senior Project Engineer James Rinaldi, and Test Technicians Isaac Gomez and Peter Cueto. The team's mandate was to investigate the flow and force margin

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

test stands PTI utilized to test the AISBVs, with an objective of evaluating the performance and operation of the test stands as well as the AISBVs function with the test stands.

126.    On or about November 11, 2020, a Non-Conformance Material Record ("NC") was issued for the test stand, assigned NC #25802, with a description that "TEST STAND RESULTS ARE IN QUESTION DUE TO INCONSISTENT RESULTS. PARTS PUT IN CLINIC (STAYS IN MRO PER KIRK) ON HOLD PER QUALITY DIRECTOR UNTIL FURTHER NOTICE [emphasis in original]." NC #25802 was closed by Abraham Jovan, without explanation and without sign off by quality engineering as required per NC procedure, on February 8, 2022.

127.    On or about November 2, 2021, a NC was issued for the test stand used to test AISBV Part Number 73340-23, assigned NC #26437. A procedure was developed by junior engineer Peter Gobell in an effort to fix the test stand and close NC #26437; however, the procedure implemented did not fix the test stand nor did it result in reliable testing results being produced by the test stand. NC #26437 was closed on February 8, 2022, at the insistence of PTI President Rowland Ellis but without explanation and without sign off by quality engineering as required per NC procedure. As of that date, notwithstanding closure of the NC, the test stand remained nonconforming and unreliable.

128.    Upon information and belief, a NC was also issued for the other test stand, assigned NC #26101, with a description "FAILED TEST FOR EXTERNAL LEAKAGE AND ATP/PROCESS…"

129.    Rather than implementing a "lockout-tagout"[53] for the nonconforming stands as warranted, the test stands were permitted to be "use[d] as is," replacing use of the "golden valve" with an inadequate calibration procedure which had been rejected by Relator.

130.    Notwithstanding the undetermined quality control and testing problems occurring at the PTI facility and, thus, the uncertainty of testing results for PTI's AISBVs, PTI nonetheless pressured Relator to approve the release of the AISBVs by way of "signing off" on a certification of conformance.

131.    Relator consistently refused PTI's requests that it "sign off" on a certification as to AISBV conformance.

132.    By way of examples, by e-mail dated December 17, 2020, Relator notified Jon Young (PTI's Senior Quality Engineer) and Ray Lopez (PTI's Director of Quality) that he would not "sign off" to approve the AISBVs, citing to inconsistent testing results, including with respect to the "Golden Valve." By e-mail of February

---

[53] Lockout-tagout is a safety procedure used to ensure that equipment is properly shut off, labeled, and not able to start up again prior to completion of necessary maintenance or repair work.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

11, 2021, in response to another request by Jon Young that Relator "sign off," Relator responded, in pertinent part:

> Hi Jon, In good conscience I cannot approve this document because of the Adjustment Wheel...Doing so is skewing (manipulating) the test data beyond the established parameters...What would happen if we were to use the Adjustment Wheel and ship product after "passing" all parameters here that technically had failed? The customer (needless to say) would be highly agitated with PTI Technologies Inc. Can the company afford the risk?"

133. When Relator would refuse to "sign off," PTI would often circumvent the Relator's engineering team. For example, by e-mail of December 7, 2020, without the approval of the team, PTI MRO Business Unit Manager Joe Del Bagno notified PTI President Rowland Ellis and several other executives and personnel that "the Engineering Team supports there is repeatability and the test stand is ok for use for T700 and CT7."

134. Notwithstanding, on January 29, 2021, PTI shipped twenty new AISBVs with Part Number 73340-23, Serial Numbers PVB00951 through PVB00970, to GEA.

135. In fulfilling GEA's January 29, 2021 order, a representative of PTI executed the "quality assurance signature," certifying, among other items, that "all items furnished with this shipment are in full compliance with all purchase order specifications and test requirements."

136.    As of June 9, 2021, as confirmed by e-mails between Relator and others at PTI, the issues with the test stand and the resulting NCs remained unsolved. In an e-mail to Ray Lopez and Kirk Martin (PTI's FAA repair station manager) on this date, Relator summarized the testing issue and concluded, "I cannot sign off on [NC # 25802], doing so puts PTI at considerable risk in regards to liability and potential loss of life should an aircraft go down."

137.    As the result of Relator's refusal to falsely certify as to compliant testing of AISBVs, PTI utilized another engineer, Abraham Jovan, to inspect the Test Stands. Mr. Jovan identified over 40 leaks and multiple problematic parts in the Flow Test Stand. Nonetheless, under pressure from management, Mr. Jovan eventually falsely certified that the Test Stand was in sufficient condition to conduct quality control testing.

138.    By e-mail to James Rinaldi dated June 22, 2021, Relator memorialized the test stand issues PTI continued to encounter as well as his observations and concerns. Relator's observations and concerns at that time included the following:

- "There are still issues with the Flow Test station. I have the data to substantiate the failures (intermittent conditions)."

- "Kanwar Suri [PTI's Sr. Vice President of Engineering] and Peter Gobell stated the test stand is good because the [73340-23] passes on the station so therefore, there are no issues with the test stand, the issues are with the CT-7

units. I told them it was highly coincidental that multiple Valves would exhibit

the same types of failures."

- "If indeed the CT-7 Golden United was 'bad' along with the rest of the CT-7

  Valves as Kanwar and Peter stated, then the following questions need to be

  answered;

  1. Why was the CT-7 Golden Unit then used to calibrate the test station?
  2. If the CT-7 units are all bad, how come no one from engineering is troubleshooting these units and replacing suspect parts?
  3. With the CT-7 Golden Unit (determined bad) used for calibration, this would effectively negate or invalidate said calibration and necessitate a need to recall all Valves shipped, (120 parts total, 117 [73340-23] and 3 CT-7's), why has this not been done?
  4. If the test station is really good, how come Kanwar has not signed off on the NC? This is NC # 25802.
  5. If the Visual Work instruction for the [73340-23] is good, how come no one other than Kanwar and Peter signed off on it?"

- "What Pete [Cueto] failed to mention from the beginning was that he never

  took the Valve off the test stand in-between test runs."

- "I have been independently stating since October of 2020 that we have an

  issue with the test stand."

139.   As of July 20, 2021, PTI engineers continued to work on calibration

instructions in an effort to fix the measurement issues being experienced with the

test stand.

140.   As confirmed by e-mails dated September 2, 2021, between Relator and several PTI representatives, NC #25802 remained open as of that date due to discrepancies noted by Relator as to the calibration procedure of the test stand.

141.   As of September 29, 2021, PTI's AISBVs testing continued to produce failing test results, as depicted in the following photograph of a Test Data Sheet for the "Engineering Valve":



**Engineering Valve 2021 - FAIL**

142.   By document dated September 30, 2021, Relator reiterated its concerns about the test stands and AISBVs to PTI Sr. Vice President of Engineering Kanwar Suri, providing its comments to the "Summary of Calibration Procedure" document for the AISBV test stands. For example:

- The "Summary of Calibration Procedure" document states "[a]s we know, currently there is no documented procedure at either PTI or VACCO for validation. However, current test stand and undocumented procedure using Golden Valve has been in use for several years and we have shipped several hundred AISBV units." Relator responded in pertinent part, "[y]es, I am aware the Golden Valve was used to validate Test Stand readings and that we have shipped several hundred AISBV Units without a documented procedure."

- When questioned about its conclusion regarding inconsistencies in AISBV test data, Relator noted in the document several observations, including:

  - "The fluctuating test failures are a good indication. This prevalent occurrence has been observed on the Golden Valve as well as the other CT-7 Valves tested. Are the Valves really all failing? To me, these are not normal failures, it is abnormal if anything. Do false positives or false negatives stir any reactions?"

  - "If the Valves are truly failing, why is no troubleshooting taking place?"

  - "The Test Stand and Golden Unit are approximately forty years old. The Test Stand has been moved over the years at least five times with four different companies during the M and A process.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

This activity as you know has the potential to compromise the

integrity of the Test Stand. Does this not factor in?"

- "We have no complete Schematic of the Test Stand and no

comprehensive theory of operation on the Valves. In short, we

do not know what we have nor do we understand it."

- "It is true that the [73340-23] Valves will complete testing

quicker and easier as the testing requirements are less stringent

than the more complex CT-7 Valves. So favorable results are

easier to come by. At the time, late December [2020]/early

January [2021], the new production Units were all assembled,

tested and shipped to the customer but if you recall, the Golden

Unit (at this time) was still used to validate the Test Stand while

we had (and still do have) an open NC on the Test Stand."

143.    Relator exchanged memos with Kanwar Suri, PTI's Sr. Vice President

of Engineering, at this time, wherein Suri stated, in pertinent part, "[a]s we know,

currently there is no documented procedure at either PTI or VACCO for validation.

However, current test stand and undocumented procedure using Golden Valve has

been in use for several years and we have shipped hundreds of AISBV units." Suri

also accused Relator of criticizing PTI and VACCO and others for expressing its

professional opinion as to validity of testing results.

144. As of November 2021, testing of the "golden valve" continued to produce failing results, as evidenced in the following "Test Data Analysis" as of November 18, 2021:



Golden Valve 2021 - FAIL

145. Relator met with PTI President Rowland Ellis on numerous occasions to discuss PTI's malfunctioning Test Stands, including conferences on October 4, 6, 11, 14, 25, and 28, November 8 and 18, and December 7, 2021.

146. In addition, Test Technician Peter Cueto located a schematic for PTI's Flow Test Stand and, upon comparing the Flow Test Stand in operation at that time

to the schematic, identified significant deviations from the schematic. In response, Relator brought this concern to the attention of PTI, through written engineering assessment, in discussion with the team, and in meeting with Rowland Ellis and other stakeholders. When efforts to address the deviations were ignored by PTI, Senior Project Engineer James Rinaldi sent written notice of the issue to ESCO.

147.   In his report to ESCO titled "Anti-Icing & Starting Bleed Air Valve (AISBV): Summary of Engineering Observations & Conclusions regarding Test Stand and Valve Functionality," James Rinaldi noted the following observations as to the team's assignment with respect to AISBV testing,   for a period of approximately one year from the time of his assignment (approximately October 2020 through October 2021):

- As witnessed by the team, and as confirmed by data recorded by PTI's Quality Department, testing measurements for AISBVs were inconsistent and fluctuated outside of acceptable limits, for testing performed on the same valve and multiple valves.

- Use of the "golden unit" was an improper and ineffective means to verify test stand performance. First, the "golden unit" was estimated to be 20-years old. Second, if the unit was not functioning properly at the time of testing, PTI lost the only reference point to verify accuracy of test stand performance.

- To properly troubleshoot the test stand, it was necessary for PTI to (a) thoroughly assess the test stand as to the conditions for proper functioning, proper assembly of the stand, and gain a sufficient understanding of how the instrumentation of the stand is used on the valve and why, and (b) develop an understanding as to each valve interacts with the stand to create the outputs recorded by PTI.

- To render sufficient testing, it was essential for PTI to simulate the conditions of the flight parameter.

- It was necessary for PTI to evaluate its testing criteria to determine whether the valve can function properly in a wider range of values than the characteristics recorded by PTI through testing. In other words, it was necessary to determine whether PTI's pass/fail criteria was proper.

- PTI personnel proposed and performed random adjustments to the test stand without sufficient knowledge as to what was being modified, what variables would be affected, and why. One such adjustment procedure was referred to as a "Compensation Wheel," in that it compensated for failing results by way of dialing in—forty-five degrees clockwise or counter-clockwise—favorable results. Any adjustment to output readings (i.e., test results) must be done with caution, if at all. Adjustment to output readings made without sufficient knowledge, and made only to yield positive outcomes for PTI (i.e., "passing"

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

the product for delivery), will only yield random, never-failing results—of course, such a method of troubleshooting is inaccurate and unrealistic.

- Because the test stands had recently been relocated to a facility owned by PTI's affiliate VACCO Industries, PTI engineers could not determine how the stands were previously assembled or reassembled upon arriving at the PTI facility.

- Rinaldi's "weariness of the test stand accuracy is not a statement that the test stand is definitely incorrect," but "[i]t is a statement that, due to the fluctuating readings, we cannot verify with certainty that it is functioning properly, that [PTI is] getting true accurate numbers, or that it is assembled properly, especially having been dismantled and moved from one facility/location to another."

- PTI engineers do not have the technical knowledge to be able to troubleshoot the AISBV product line from an engineering perspective and, therefore, no engineer has valid signature authority to certify conformity of the AISBV without possibility such certification would "be deemed a falsification."

148.   In discussing the Test Stands with other PTI personnel, Relator learned that the inconsistent and questionable testing data being derived from the Test Stands was not a new issue to ESCO or its subsidiaries and affiliated entities; rather, personnel transferring to PTI from VACCO were well aware that engineers had been

attempting to fix the Test Stand issue for several years. In fact, some personnel indicated that the issue existed for "decades."

149.    As confirmed by e-mails dated October 18, 2021, PTI had not addressed the problems with its Test Stands as of that date. On October 18, David Conrad, PTI's Vice President of Business Development, e-mailed PTI President Rowland Ellis stating:

> Rowland,
>
> After our brief discussion today regarding the test stand, I was talking to Scott [Cirricione, PTI Business Unit Manager, MRO] about some customer calls. During the discussion, I was a bit shocked that Scott has uncovered that we have 26 AISBV's in house for repair, some of which are a year old. How soon can we get our stand up and running to clear these out? At roughly $15,000 each, this is $390K in sales revenue.

150.    A chart provided by Scott Cirricione to David Conrad, by e-mail on October 18, 2021, catalogs the defective 26 AISBV units referenced in Mr. Conrad's e-mail, including Part Numbers 73340-20, 73340-22, 73340-23, and 82880-3, as follows:

| Received | RMA | PN | Customer |
|----------|--------|----------|----------------------|
| 3/9/2020 | 904601 | 73340-23 | GE MSO DISTRIBUTION |
| 3/25/2020 | 904577 | 73340-23 | GE MSO DISTRIBUTION |
| 8/31/2020 | 904868 | 73340-23 | GE AVIATION |

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

| 10/28/2020 | 904957 | 82880-3 | LOGANAIR LIMITED |
|---|---|---|---|
| 11/30/2020 | 904978 | 73340-22 | GE AVIATION |
| 11/30/2020 | 904979 | 73340-22 | GE AVIATION |
| 12/2/2020 | 904977 | 73340-23 | GE AVIATION |
| 1/20/2021 | 905101 | 73340-20 | STANDARD AERO |
| 3/1/2021 | 905261 | 73340-20 | STANDARD AERO |
| 3/9/2021 | 905399 | 73340-23 | GE AVIATION |
| 3/9/2021 | 905391 | 73340-20 | STANDARD AERO |
| 4/19/2021 | 905489 | 73340-20 | STANDARD AERO |
| 4/26/2021 | 905490 | 73340-20 | STANDARD AERO |
| 5/11/2021 | 905483 | 73340-23 | GE AVIATION |
| 5/17/2021 | 905545 | 73340-23 | GE AVIATION |
| 6/28/2021 | 905606 | 73340-20 | AVIOJET CORP. |
| 7/27/2021 | 905647 | 82880-3 | H+S AVIATION LIMITED |
| 8/3/2021 | 905655 | 73340-20 | STANDARD AERO |
| 8/9/2021 | 905672 | 73340-20 | STANDARD AERO |
| 8/30/2021 | 905698 | 73340-20 | STANDARD AERO |
| 9/9/2021 | 905716 | 73340-20 | STANDARD AERO |
| 9/9/2021 | 905704 | 73340-23 | GE MSO DISTRIBUTION |

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

| 9/14/2021 | 905712 | 73340-20 | STANDARD AERO |
| 9/15/2021 | 905945 | 82880-3 | LOGANAIR LIMITED |
| 9/16/2021 | 905719 | 73340-20 | STANDARD AERO |
| 9/22/2021 | 905720 | 73340-23 | GE AVIATION |

151. In response to an inquiry from a representative of Standard Aero in regard to the 12 AISBV units needing repair, Scott Cirricione responded on October 18, 2021, in pertinent part, that "[u]nfortunately, we are experiencing issues with our T700 test bench stand that is required for both pre and post repair testing of these units. Our Quality and Engineering Management are fully engaged to resolve this matter; however, it is likely that we will not be operational until the end of the year."

152. On February 23, 2022, NC #25802 was finally closed, with the disposition reflected as "Test stand is producing repeatable data after maintenance. Suggested improvement: Implement quarterly maintenance schedule to clean the system." The information reflected on the NC document is not true—as of that date, the test stand remained nonconforming and unreliable.

153. In his March 17, 2022 "T-700 Test Stand Investigation Summary of Findings," Abraham Jovan described the factors he "studied to determine the reason for ATP test failures of the T-700 Test stand," and noted in pertinent part, among other items, that:

- "There was a lot of dirt in the system and filters seemed very clean. Re-evaluate filters?"

- "Fine and superfine elements were installed in the wrong order...The filters were replaced with a different model when moved to PTI and the filter used in VACCO was significantly larger."

- "The leaks found in system may have been a contributing factor to the test failures. After repairing all leaks, there were still ATP some failures."

- "The length, diameter, material, and condition (cleanliness, dents, bends) of these tubes has the most significant effect on readings. We still do not have a schematic which shows the test stand in full detail."

- "Moreover, the Engineering Valve, which is also used for test stand verification was passing in 2019, failing in 2021, and passing in 2022 after the test stand maintenance, further indicating the valves were not the cause of the failure, and that the test stand was the root cause of the ATP failures."

- "The IGV tube is misaligned with the flow meter. This places the tube under constant stress. The plumbing needs to be updated to correct this condition."

- "Furthermore, even if after all the precautions, a bad unit is shipped, it will be promptly returned since the customers bench test each unit upon receipt."

- "At present time, the only way to check the readings at all cam positions is using an actual valve. The 'Golden Valve,' which is a dash-3 valve has always been used for this purpose."

154. By e-mail dated April 11, 2022, GEA's Lead Supplier Quality Engineer for the Aviation Supply Chain, Sue Gordon, notified PTI that an AISBV from the January 29, 2021 Order, Part Number 73340-23 and Serial Number PVB00953, was nonconforming in that it "failed in the test cell," and was being returned for PTI to conduct "a Quality Investigation to determine what the problem is and why a new part that has not yet entered service with a Customer has failed." Ms. Gordon further stated in her e-mail, "[s]omebody from PTI (not sure who this is at the moment) needs to provide a Quality Investigation to me."

155. In a April 13, 2022 presentation to PTI stakeholders in regard to GEA's request for an investigation of AISBV Part Number 73340-23, Serial Number PVB00953, Relator provided a copy of the e-mail from Ms. Gordon, a copy of the packing slip with certification of "full compliance with all purchase order specifications and test requirements" for the subject part, a copy of two Non-Conformance Material Records for the subject nonconforming Flow Test Stand, a summary of the nonconforming AISBVs recently shipped, and a summary of its "ethical dilemma" if he were to provide responsive information to GEA. Relator concluded its presentation with the following statement:

Due to my extensive involvement in the AISBV matter from essentially my beginning at PTI Technologies Inc., I am unable/unwilling to provide what I would consider to be untruthful/incorrect information to the customer as I am ethically bound by AS9100 Standards and Practices as well as the Engineering Code of Ethics.

156. At all times relevant hereto, PTI knew that its test stands used for its AISBVs were not properly functional, therefore, resulting in nonconforming AISBVs or, at best, unreliable quality control and performance testing being conducted on the AISBVs. Notwithstanding PTI's inability to perform meaningful quality control and performance testing on the AISBVs, and notwithstanding that PTI's AISBVs were nonconforming, PTI shipped the nonconforming AISBVs for use in U.S. military aircraft and pursuant to U.S. government programs such as the Foreign Military Sales Program, including the following 39 units:

| Date Shipped | Packing List No. | Part No. | Quantity | Customer |
|---|---|---|---|---|
| 1/24/2022 | 94118 | 73340-23 | 2 | GE Aviation |
| 5/22/2022 | 97226 | 73340-23 | 2 | GE Aviation |
| 5/27/2022 | 97229 | 73340-23 | 5 | GE Aviation |
| 5/27/2022 | 97225 | 73340-23 | 1 | GE Aviation |
| 5/27/2022 | 97227 | 73340-23 | 4 | GE Aviation |
| 5/27/2022 | 97228 | 73340-23 | 10 | GE Aviation |
| 5/27/2022 | 97724 | 73340-23 | 1 | GE Aviation |

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

| 6/28/2022 | 97757 | 73340-23 | 5 | GE Aviation |
| 6/28/2022 | 97754 | 73340-23 | 3 | GE Aviation |
| 6/28/2022 | 97756 | 73340-23 | 6 | GE Aviation |

157.  Defendants failed to cure deficiencies in the AISBV and failed to notify the U.S. Government of the deficiencies, directly or indirectly.

158.  Per FAA regulations, as well as Defendants' internal policies, the Defendants were, at all times relevant hereto, required to report to FAA any malfunctions, defects, unapproved parts, or un-airworthy conditions. Per PTI policy, the Quality Assurance Manager is required to report to FAA within 96 hours after it discovers any serious failure, malfunction, or defects of an article. Upon information and belief, PTI, VACCO, and ESCO have not informed FAA of the issues with respect to its AISBVs or Test Stands.

159.  Pursuant to contractual provisions between Defendants and the United States required under DFARS, Defendants were required to notify the Government "as soon as practicable, but not later than 72 hours, after discovering or acquiring credible information concerning" the AISBVs nonconformances or deficiencies. *See* 48 C.F.R. 252.246-7003(b) and (c). Upon information and belief, Defendants have not informed the United States—neither directly nor through a primary contractor such as GEA—of the issues with respect to its AISBVs or Test Stands.

160.   Defendants failed to comply with quality assurance terms and requirements under their various contracts with the United States and, for use by the United States or for a U.S. program such as the Foreign Military Sales program, GEA. The quality terms and requirements, at all times relevant hereto, were material to claims for payment by the United States Government, directly or indirectly. The United States, directly or indirectly, would not have accepted or paid for a Flight Safety Critical-designated part without truthful certification that the AISBVs were properly tested and deemed conforming. The United States, directly or indirectly, would not have paid for worthless quality control and performance testing on the AISBVs.

**2.     Defendants Knowingly Sold Defective AISBVs for Installation in U.S. Military Helicopters and Helicopters Sold Pursuant to the Foreign Military Sales Program**

161.   Unrelated to the above-described measurement issues associated with the Test Stands, contractors including GEA notified PTI of performance failures in the AISBVs. Pilots reported false cockpit indications of the AISBV being open (de-icing) while in cruise or full-power flight—the AISBV is intended to be closed during cruise or full-power flight unless the pilot manually commands the AISBV open for de-icing.

162.   GEA reported to PTI that, as the result of such performance failures, the AISBVs had been removed from service in operational hours ranging from 0 to

approximately 2100 hours. The wide range of failure hours suggested a lack of predictability of valve performance and failure, and led to numerous engineering investigations to determine root cause for possible product improvements.

163.   After numerous engineering investigations and reports conducted on a range of AISBV serial numbers returned to PTI by GEA, the engineering teams at PTI and GEA jointly concluded that the switch mechanism is the focal point of AISBV performance failures.

164.   In regard to AISBV Part Number 73340-23, switch anomalies and issues were observed, documented by PTI, and can be categorized into three separate loading and failure conditions:

1) Switch Actuator Arm deformation/bending inducing a permanent set (yielding): This includes mechanical cycle fatigue, thermal cycling, and uneven (asymmetric) loading on the thin sheet metal design. With cyclic loading at elevated temperatures with each duty cycle, the metal deforms permanently (yielding). Fatigue cycling (mechanical/thermal, and vibration) needs to be a consideration when designing/proposing a product improvement for implementation. As the Arm experiences in-service mechanical and thermal duty cycles, the angles of the original component increase due to yielding.



Photographs depict Switch Actuator Arm in bending deformation



Photographs depict Switch Actuator Arm in torsional deformation

2) Switch Actuator Arm wear: This condition takes up a portion of the intended travel of the Switch Actuator Arm, contingent upon the depth or amount of wear the Switch Arm experiences. Therefore, the depth of the lost material lessens the intended travel of the arm by that depth amount. The wear component reduces the material cross-section of the Switch Actuator Arm, thereby weakening the arm structurally and allowing for further deflection, which exacerbates the problem.



Photographs depict Switch Actuator Arm wear

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

3) Internal Micro-Switch Failures: Various engineering investigations have

shown situations where the switch fails to change state when actuated, which

in an internal failure of the switch and potentially a latent design defect.

165.  PTI's investigation concluded that the combined effects of Switch

Actuator Arm deformation/bending and wear (#1 and #2 above) have the

consequence of reducing the intended actuated travel of the Switch Arm. The lost

travel is absorbed by the combination of negative feedback loop relationship

between deflection and wear, resulting in prevention of the internal Micro-Switch

mechanism from changing state while the Driver is in full travel position.

166.  Defendants intentionally shipped the nonconforming AISBV, including

for use in U.S. military aircraft or for use in United States government-sponsored

programs such as the Foreign Military Sales program

167.  Defendants failed to cure these deficiencies in the AISBV and failed to

notify the U.S. Government of the deficiencies, directly or indirectly.

### 3.    Summary of Defendants' False or Fraudulent Claims

168.  Defendants submitted false or fraudulent claims to the United States for

production of or service to AISBVs including, but not limited to, as follows:

- Knowing that it did not have the ability to perform meaningful quality control

  and performance testing on the AISBVs it produced, Defendants fraudulently

induced the Government to enter into various contracts, including the $27,385,049 firm fixed-price, indefinite-delivery/indefinite-quantity contract for PTI to produce AISBVs. Accordingly, all claims submitted by Defendants to the United States pursuant to such contracts are false or fraudulent.

- Knowing that the AISBV unit had failed testing performed or that its Test Stands did not produce accurate and reliable test results, Defendants expressly falsely certified that the AISBV unit furnished for use by the United States or through a U.S.-sponsored program, such as the Foreign Military Sales program, was of sufficient quality and conformed in all respects with the contract requirements.

- Defendants recorded falsified or otherwise inaccurate readings and results documentation of quality control and performance testing allegedly performed, and expressly certified that the AISBVs shipped by PTI were compliant with the United States' specifications and testing requirements and, without disclosing the falsity of same, that testing reports were on file and available for review.

- Knowing that the AISBVs it produced were defective, PTI fraudulently induced the Government to enter contracts, including the $27,385,049 firm fixed-price, indefinite-delivery/indefinite-quantity contract for PTI to produce

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

AISBVs. Accordingly, all claims submitted by PTI to the United States pursuant to such contracts are false or fraudulent.

- In submitting claims for payment, Defendants falsely impliedly certified compliance with all statutes, rules, and regulations governing its contracts with GEA and the United States, including applicable notice requirements for non-conformities and deficiencies identified with respect to the AISBVs and the Test Stands.

- Had the United States known that Defendants' AISBV units failed quality control and performance testing, or that Defendants' Test Stands did not produce accurate and reliable test results, the United States would not have contracted with Defendants or would have contracted at a reduced price per unit.

169.   Upon information and belief, Defendants have not recalled the subject AISBV units nor have they refunded to the United States any amounts Defendants received for payments derived from the U.S. government "fisc" for their false or fraudulent claims.

**H.    Defendants Retaliated Against Relator Because of Lawful Acts in Furtherance of This Action**

170.   In or about September of 2020, Relator was assigned to PTI's T700 Lab.

171.  In assisting in the investigation as assigned, Relator relayed to PTI's management its professional opinions in regard to the test stands used to test the AISBVs including, but not limited to, that testing measurements for AISBVs were inconsistent and fluctuated outside of acceptable limits, use of the "golden unit" was an improper and ineffective means to verify test stand performance, PTI did not verify with certainty that the AISBVs were functioning properly, PTI's Compensation Wheel adjustment was improper and resulted in unreliable results, and that PTI engineers do not have the technical knowledge to be able to troubleshoot the AISBV product line from an engineering perspective and, therefore, he was unwilling to "sign off" on the AISBV product or Test Stands and was unwilling to provide "untruthful/incorrect information" to GEA.

172.  PTI's management took exception to Relator's professional opinion. Rather than expressing gratitude to Relator for coming forward and seeking to reform the company, Defendants retaliated against him, including by excluding Relator from important activities including meetings he otherwise would expect to attend, reassignment to matters resulting in significant increase to workload, and harassment and intimidation including increased and constant surveillance. The Defendants' retaliatory actions were, not coincidentally, taken shortly after Relator raised its concerns about the illegal conduct.

173.  Relator's efforts to alert Defendants that their conduct was illegal reasonably could have led to an FCA action, because proof that Defendants' production of nonconforming AISBVs and lack of meaningful testing through nonconforming Test Stands caused false claims to be submitted to the government would demonstrate a violation of the FCA.

174.  As a direct and proximate result of this unlawful retaliation, Relator has suffered emotional pain and mental anguish.

## VI.    CAUSES OF ACTION

### COUNT ONE – FALSE OR FRAUDULENT CLAIMS UNDER FALSE CLAIMS ACT

175.  Relator re-alleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

176.  By virtue of the acts described above, PTI, VACCO, and ESCO, knowingly presented or caused to be presented, to an officer or employee of the United States and/or a contractor, grantee, or other recipient of money on behalf of the United States Government or to advance a program or interest of the United States Government where the United States Government provided the money requested or demanded, in whole or in part, a false or fraudulent claim for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is,

PTI, VACCO, and ESCO knowingly made or presented, or caused to be made or presented, to the United States, claims for payment for nonconforming products.

177.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 as adjusted per false claim.

**COUNT TWO – FALSE STATEMENTS UNDER FALSE CLAIMS ACT**

178.   Relator re-alleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

179.   By virtue of the acts described above, PTI, VACCO, and ESCO, knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim to the United States government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

180.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 as adjusted per false claim.

## COUNT THREE – CONSPIRACY TO PRESENT FALSE OR FRAUDULENT CLAIMS

181.   Relator re-alleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

182.   Defendants, among themselves and with their co-conspirators, knowingly conspired to present or cause to be presented to the United States—and/or contractors, grantees, or other recipients on behalf of the United States provided with or reimbursed by funds of the United States—false or fraudulent claims for payment or approval.

183.   Defendants and their co-conspirators knowingly conspired to make, use, or cause to be made or used false records or false statements that were material to claims for payment or approval to the United States.

184.   The United States has suffered damages because of Defendants' alleged conduct.

185.   The United States is entitled to an award of treble its damages, plus statutory penalties pursuant to 31 U.S.C. § 3729(a)(1).

186.   The United States is also entitled to its costs in prosecuting this litigation against Defendants, pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT FOUR – UNJUST ENRICHMENT TO DETRIMENT OF U.S.

187.   Relator re-alleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

188.   This is a claim by the United States for recovery of monies by which PTI, VACCO, and ESCO have been unjustly enriched.

189.   By virtue of the conduct and the acts described above, PTI, VACCO, and ESCO were unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## COUNT FIVE – PAYMENT BY MISTAKE

190.   Relator re-alleges and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

191.   This is a claim by the United States for the recovery of monies paid to PTI, VACCO, and ESCO by mistake for goods that did not conform to government contracts and specifications, unbeknownst to the United States.

192.   As a consequence of the conduct and the acts set forth above, PTI, VACCO, and ESCO were paid by mistake by the United States in an amount to be

determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## COUNT SIX – RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(H)

193.   Relator realleges and incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

194.   Relator was engaged in conduct protected under the FCA, including the investigation and reporting of fraud.

195.   Defendants knew that Relator was engaged in such protected conduct.

196.   The negative employment action taken against Relator by Defendants was because of Relator's involvement in the protected conduct, causing Relator to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

## COUNT SEVEN – RETALIATION IN VIOLATION OF CAL. LABOR CODE § 1102.5

197.   Relator realleges and incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

198.   At all times relevant hereto, Cal. Labor Code § 1102.5 was in full force and effect and was binding upon Defendants, and each of them.

199.   Cal. Labor Code § 1102.5(a) provides:

> An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from

disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

200.   Cal. Labor Code § 1102.5(b) provides:

An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

201.   Cal. Labor Code § 1102.5(c) provides:

An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

202.    As detailed herein, Defendants retaliated against Relator as a result of its refusal to participate in Defendants' fraudulent scheme and/or for disclosing information to FAA and/or other government entities about Defendants' violation or noncompliance with federal regulations and contract provisions and the resulting safety risk caused thereby.

203.    As a direct and proximate result of the unlawful employment practices described herein, Relator was caused to suffer, and continues to suffer, substantial financial and emotional damage in an amount to be proven at trial.

## COUNT EIGHT - RETALIATION IN VIOLATION OF CAL. LABOR CODE § 98.6

204.    Relator realleges and incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

205.    At all times relevant hereto, Cal. Labor Code § 98.6 was in full force and effect and was binding upon Defendants, and each of them.

206.    Cal. Labor Code § 98.6 provides that an employer may not discharge an employee or in any manner discriminate, retaliate, or take adverse action against any employee […] because of the exercise by the employee […] on behalf of himself, herself, or others of any rights afforded him or her."

207.    Plaintiffs may assert a claim under Cal. Labor Code § 98.6 for adverse action taken because of an employee's exercise of rights afforded to him or her by

other provisions of the Labor Code, such as Cal. Labor Code § 1102.5. *See Grinzi v. San Diego Hospice Corp.*, 14 Cal. Rptr. 3d 893, 903-04 (Cal. Ct. App. 2004).

208.    As detailed herein, Defendants retaliated against Relator as a result of its refusal to participate in Defendants' fraudulent scheme and/or for disclosing information to FAA and/or other government entities about Defendants' violation or noncompliance with federal regulations and contract provisions and the resulting safety risk caused thereby.

209.    The adverse action taken against Relator by Defendants resulted from the exercise of rights under Cal. Labor Code § 1102.5 by Relator. As set forth above, Cal. Labor Code § 1102.5, in part, affords a relator the right to be free from retaliation by his or her employer and/or any person acting on behalf of his or her employer, for disclosing information to an employer with authority to investigate, discover, or correct the violation, so long as the relator reasonably believed that the information disclosed was a violation of state of federal law.

210.    As a direct and proximate result of the unlawful employment practices described herein, Relator was caused to suffer, and continues to suffer, substantial financial and emotional damage in an amount to be proven at trial.

211.    In addition, Relator, for each violation of Cal. Labor Code § 98.6, seek civil penalties of $10,000 per employee for each violation pursuant to Cal. Labor Code § 98.6(b)(3) and, pursuant to Cal. Code Civ. Pro. § 1021.5 as Relator hereby

seeks to enforce an important right affecting the public interest, an award of reasonable attorneys' fees and costs incurred in bringing this claim.

## VII.  PRAYER FOR RELIEF

**WHEREFORE**, Relator prays that judgment be entered against Defendants, PTI Technologies Inc., VACCO Industries, and ESCO Technologies Inc., ordering as follows:

A.      That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

B.      That civil penalties of not less than $11,665 and up to $23,331 per claim as provided by 31 U.S.C. § 3729(a) and as adjusted for inflation be imposed for each and every false or fraudulent claim that Defendants caused to be submitted to the United States and/or its grantees, for each false record or statement Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim, that three times the amount of damages the United States sustained because of Defendants' actions also be imposed;

C.      That Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

D.      That Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct, plus interest;

E.       That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

F.       That Relator be awarded all costs, including but not limited to, court costs, expert fees and all attorney fees, costs and expenses incurred by Relator in the prosecution of this suit; and

G.       That Relator be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Oxnard Challenger LLC demands a trial by jury of all issues so triable.

Dated: November 21, 2022                Respectfully submitted,

**KABATECK LLP**


SHANT KARNIKIAN, ESQ.
sk@kbklawyers.com
633 West Fifth Street, Suite 3200
Los Angeles, CA 90071
Tel:  (213) 217-5027
Fax: (213) 217-5010

*Local Counsel Pursuant to L.R. 83-2.1.3.4*

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

STEPHEN A. WEISS, ESQ.
(*pro hac vice* forthcoming)
sweiss@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.
(*pro hac vice* forthcoming)
jsmigelsky@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  (973) 639-9100
Fax:  (973) 639-9393

SHAUNA B. ITRI, ESQ.
(*pro hac vice* forthcoming)
sitri@seegerweiss.com
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Tel: (215) 564-2300
Fax: (215) 851-8029

*Attorneys for Plaintiff/Relator*